Good afternoon, everybody. This is case number 1-18-1887, Estate of Marilyn Perez v. State Alexis Medical Center and Jeffrey Chung. We are here today for an oral argument held via Zoom. Your panel, as you can see, is myself, Justice Connors, and Justice Harris. Let me just briefly tell you what our plan is, and then I would like the lawyers to state their names for the record. We're going to give each side 10 uninterrupted minutes, followed by questions. I'll turn to Justice Connors and Justice Harris, and then I will take the last slot for questions. The appellant may, if the appellant so chooses, reserve some of 10 minutes for rebuttal. There will probably not be any questions after the rebuttal, though if anyone has an urgent question, I will certainly give them an opportunity to ask. Are there any questions about the procedure? No, Your Honor. Yes, Your Honor. Hugh Griffin. Karen DeGrant and I have two different clients. We each have a separate argument that we're going to make on behalf of our clients. So are we confined, the two of us are confined to the 10 minutes? Well, I should have anticipated that question. It's a very good question. I will just exercise presiding justice prerogative and say that you each have seven minutes. Okay, and then your questioning would be after each of us. After each of you, we will then ask questions. Okay. So Karen would get questions when she's done, and I'll get questions when I'm done. Thank you very much. And we'll give the appellant a little latitude on time, too, since there are two different arguments to respond to. So to the extent that you need a little more time for rebuttal, we will give that to you. Does that all seem fair to everybody? That's fine with me, Judge. Okay. All right. And just for the record, can all the lawyers beginning with the appellant just state your names for the record? My name is Bob Baeser. It's shown as David Nyman. David's younger than me and is in charge of technology. Okay, Mr. Baeser. If I call you Good afternoon, Your Honors. Karen DeGrand on behalf of the appellee, Dr. Chung. Hugh Griffin on behalf of defendant appellee, St. Alexis Medical Center. Okay, Mr. Baeser, whenever you're ready. Thank you. Good afternoon, and may it please the court. And I would like to reserve five minutes of my time for the two-issue rule. Two-issue rule doesn't apply in this case for two reasons. First, there's only one issue, and I'll go into that. And second, there's no way to fashion a special interrogatory as the Inman case, which we supplemented and came out after the briefing points out. And to note, defendants have never even suggested what a special interrogatory could be under the circumstances here. So the only issue in the case is Dr. Chung's negligence. Approximate cause between his report and what Dr. Michael did is a given. It's not even contested. Dr. Michael testified that he relied on Dr. Chung's report. Our expert said that he relied on it. Dr. Michael's said that he relied on it. And most importantly, Dr. Michael's office note showed that he relied on it. No one disputed that. So the reliance on the report, the approximate cause of the report, is a given in this case. It's whether Dr. Chung was negligent in preparing the report. So the issue for the trial would have been, based on the 213 admission of Dr. Chung, whether Dr. Chung needed to report the teratoma in his report. That's what Dr. Gore said, our expert. That's what the ACR guideline says. And significantly, that's what Dr. Sula, Dr. Chung's partner, did. Dr. Sula is the the only other radiologist in the case who reviewed an ultrasound of Marilyn, reviewed an ultrasound of Marilyn, and for the purpose of determining the cause of her that exhibit 902 of the defendants stopped five days before his report. In his report, he noted that there was a teratoma shown two months earlier on the on a CT taken. Not two hours earlier, as Dr. Chung didn't do, but two months earlier. So for the 213 admission, to make any sense, the only way Dr. Chung could have possibly had his custom and practice to be to know about the prior exam, there's only one way, and that is through the requisition form. So the requisition form lists the prior exams, and that's the only way he could have known about the prior CT, which he admitted was his custom and practice to do. Even though... Counsel, may I ask a question? Sure. You can hear me? It seems to me that what's important in this case, and I'd like you to address it, under rule 213, sub F sub three, it appears that the trial court made a distinction between allowing the use of Chung's disclosures for his intended testimony as an examining expert witness, but the court did not allow that to be in this case. Can you address yourself to that issue? Well, I don't... The court, they objected to to us using it at trial because it was signed by his attorney, just as an answer to a complaint would be signed by by an attorney. And somehow the issue of privilege came up, and as we noted in our reply brief, Jackson versus Reed says there is no privilege if your doctor is testifying as an expert. But I still don't understand where the privilege issue comes in. It is an admission. It is clearly an admission that goes to the heart of the case, and by not letting us use it, by not letting us use his admission, it undermined our whole case. Because that's exactly what Dr. Chung did. His custom and practice was to compare. You have his ultrasound, and you have the CT, and you both up on screens, and you scroll through them, and you compare one to the other. So I don't see a privilege issue there at all. And I don't think that the defendants have explained where it would come in, any more so than with an answer to a complaint. They answered a few things in the complaint that we were able to read to the jury. The – and anyway, so the only way he would know that is through the requisition form. The requisition lists the prior exams, and so we've lost the 213 admission, and then the only way that he would have known about it, we lose that too because Dr. Chung chooses to lie. And he – which we found out two months later in the Newberry case. And in the Newberry case, he said about the requisition forms, it's part of the paperwork that pops up. It's included when I open the case. It is standard practice that it lists prior exams. But in our case, he's asked this question. Is this something you ever look at or use? And he says no. He never uses a requisition form. That's contrary to the standard practice, and contrary to what he said was his custom and practice in the admission we couldn't use. And then with what turned out to be that lie about a counsel talks about that he's too busy to go fishing through the system. He can't go fishing through the system to find out if there was a prior exam. Telling you a trial, it sounded like he would have had to go running around the hospital asking, by the way, anybody see a prior exam on this guy? But that's what St. Alexius's attorney took it and ran with. So the effect of that is that we can't use his admission. He never looks at a requisition form. He lies about the requisition form on the most material issue in our case. And it's like, you know, in these days of truth isn't truth, alternative facts, you know, we're asking not to allow this in a court of law. Mr. Baser, just finish up so that you can reserve some time for rebuttal and so that we can ask our questions. So you have just about a minute if there's any other points you want to make. Okay, I was interrupted for a couple of minutes. I know, I give you credit for that. And I'm going to give you five minutes on rebuttal. So okay, the cumulative errors and why this should be held against St. Alexius. Is there any limit as to what a principal can do to defend an apparent agent to get itself off the hook? And we're saying here that St. Alexius easily crossed that line. Let's look at what they did. First of all, Dr. Bova was their expert. They waited until 724 the morning of court to send us his PDF. They slipped in the sagittal image that is clearly not demonstrative by any chance and Dr. Bova said it wasn't. We couldn't use a stock photo of a teratoma. They misrepresented the meaning of 213. They objected to my correct summary of 213. They crossed the bright line of 213. They didn't even respond in their briefs to our argument that they should be responsible for the cumulative errors. Then they objected to our correct version of 105.10 and they objected to 50.10. They used St. Alexius in their consent form, independent contractor and agent. They didn't need to. But then they objected to us trying to define it with the jury instructions. Had it been defined, we certainly put in plenty of evidence that Dr. Chung was not an independent contractor. They put in evidence he was not an employee. And one thing for sure, we're not asking for just any of you to side with us. We're asking for either all of you or at least two of you. Not any or all. I can assure you of that. I think you want me to wind down. So I don't know why they didn't just say in their contract because it was clear from the evidence that Dr. Chung was likely not an independent contractor. The jury would have been impossible for them to say that Marilyn should have known that he was an independent contractor. But why didn't they just say that they're not responsible for the negligence of any of their doctors just like they said they're not responsible for personal property instead of using the word independent contractor and then not allowing it to be defined. Anyway, we were denied a fair trial for lots of reasons. We're asking that you give the Perez family their day in court. Thank you, counsel. Justice Connors. Thank you, Justice. Mr. Bayser, I guess I like your backdrop. What is that? The House of Lords? It's no, as I found out from from my technical expert over here, the University of Michigan Law Library where I didn't have a picture of Northwestern's law library. Oh, blue. Okay. All right, Mr. Bayser. Let me ask you this question. Was there testimony that the ultrasound that was ordered by Dr. Siraj and interpreted by Dr. Chung had a directive as to its purpose? No, the purpose was to determine pain. And they did in the ultrasound, they did it three different ways. And one way was to determine the blood flow. That was only one of the three ways it was determined to determine the cause of Marilyn's pain, just as the CT was. All right. Thank you. Um, was there testimony in the record that there were other ultrasounds that were taken of the decedent, and they did not show teratoma as well? There were ultrasounds taken. And I want to reiterate that we never said that Dr. Chung should have seen the teratoma on the ultrasound. The issue is there was a there was a CT two hours before that based on his custom and practice that we couldn't get in, he would have compared it to he would have seen there was a teratoma on the CT, just as Dr. Sula did later. The other ultrasounds were pregnancy ultrasounds. And and they were to determine the viability of the fetuses, not to not to check into the adnexa. And so they were fired. It's apples and apples and oranges. So the only other ultrasound in this case that had to do to determine pain was Dr. Sula's, and he compared it to the CT taken two months before. All right, Dr. Excuse me, counselor, let's talk about the IPI civil 105.10. Now you asked to insert the word or agent or words or agent in there. Is that correct? Correct. Now, is there any case law to suggest that that instruction as given by the trial court, misstated the law that existed at that time? I think I think that the, the instruction is an apparent agency instruction. And the cases that we cited, talk about agent or employee. And I think as your is aware that that the the IPI has now been corrected. And I understand it's been changed. But again, did it misstate the law that was in place at that time? I believe it did. Okay, for sure. It was it was an apparent employee instruction. All right, let me ask you this then as far as the IPI civil 50.10. It defines agent and it defines independent contractor, correct? Yes. Now, it doesn't define or discuss apparent agency, does it? No. So how would that be helpful to the jury if it didn't define really the issue in the case? Sure, the the the consent form said that he was not an employee. The hospital brought up evidence that he was not an employee. The hospital said he was an independent contractor. We brought in a lot of evidence to show he was not an evident of an impaired independent contractor. The jury, having been defined, could easily have determined that that he was not an independent contractor, or that he might have been an independent contractor, but determined that Marilyn that that there was no way for them to hold Marilyn to believe that she should have known that he was an independent contractor. A jury having had the the definition would would never have held Marilyn to that to that determination. All right. Thank you, counsel. One last question. As far as the 213 F slash three or trend three, the case you used to support your argument in that is York versus Ghanzuli. Is that right? It was there. It was one of the cases. Right, right, right. But that concerns an expert witness, not a person who gave the 213 response as a party. Is that right? Right. Do you have any any cases you want to support as a basis, using a party, not an expert witness? For sure, Reed versus Jackson, which I which I mentioned, that is, that's right on point. But I think it's even more so with a with a party, that it should be used because it's signed by his by the party's attorney. And it's the same. I don't see any distinction between that and an answer to the complaint, which is also signed by the party's attorney. Thank you, sir. Thank you. I'm sure to make the thank you. Thank you. Justice Harris, do you have any additional questions? Oh, I do not. So, there was no offer of proof made. And there's a lot about that in the briefing as to how this interrogatory answer could have been used, correct? No, there was no offer of proof. Right. So my I'm and part of the defendant's argument is any value that could have been gotten was gotten other way. So my question is, how do we evaluate that without an offer of proof? What could you have done with this interrogatory answer that didn't get done other ways through the deposition, closing argument, etc? Well, as I would like to hope that we pointed out in our brief, the other ways were completely ineffective, completely. They, you know, two or three. But tell me what you would have done. Well, some of what we would have done would have would have depended on what Dr. Chung, how he tried to distinguish it. But all we needed to do was put it up on the screen. And this and have the judge instruct them that this is evidence in the case. This is Dr. Chung's custom and practice. We didn't need any more than that. Okay. Okay. And then my other question for you is, was there any evidence? I think your answer to this is no. In your view, is there any evidence or argument that Dr. Chung's report was not the proximate cause of the injury in this case? None. There was, there was, it was not, not debatable, not, you know, that this is what the doctor, what Dr. Michael relied on. Clearly, there was no expert testimony to the contrary. There was no other witnesses testimony. Dr. Chung said he expects doctors to rely on his reports. There is nothing. I assume the jury was instructed as to the elements of what they needed to find. And one of those elements was proximate cause. Sure. But, but for the instruction and the burden of proof instruction both say, if you find that he was negligent, then the negligence needs to be the proximate cause. So we were denied evidence of his negligence. So there's no way that there is no way that anyone could have thought that he didn't rely on that report. The issue was whether the report was going first. Mr. Grand is. Okay. You may begin. Karen, I think you're on mute. Oh, she is. I'm sorry. I was on mute. Again. You were brilliant. That was the smartest thing that I had to say. And now it's gone. Again, good afternoon, your honors. And may it please the court and counsel, Karen DeGrant for Dr. Chung. The notion that proximate cause was a given for the plaintiffs is utterly and soundly refuted by the trial record in this case. In fact, one response to what is admittedly on the plaintiff's part, an appeal that depends solely on matters pertaining to the standard of care is that this is a quintessential two issue rule of case. The evidence that Dr. Chung's alleged conduct was a proximate cause was almost non-existent. And in fact, the evidence on the defense side, in my view, and I think the record bears this out, was overwhelming. The issue of plaintiffs claimed evidentiary errors has to be considered in the proper context. And that is the impact of the two issue rule. This really brings us to the plaintiff's case against the obstetrician, Dr. Michael. The jury heard extensive testimony concerning Dr. Michael's conduct, and there was extensive testimony that would fully support the conclusion that Dr. Chung's CT or rather ultrasound report had nothing to do with the injuries and the death of Ms. Perez. Plaintiff's arguments, again, admittedly all pertain to the standard of care, and whether Dr. Chung mentioned Dr. Gola's teratoma findings in his ultrasound report, and whether he properly indicated in his ultrasound report that the left ovary was unremarkable. By all accounts, all accounts, including plaintiff's experts, Dr. Gore and Dr. Del Carmen, and even Dr. Michael, the ultrasound findings would never negate the CT findings of a Dr. Gore, plaintiff's standard of care expert against Dr. Chung, and the final question of the hospital attorney's cross-examination, in which Dr. Gore agreed that looking at the CT results of August 11, 2012, interpreted by Dr. Golo, Dr. Golo's diagnosis remained valid and So, the record makes clear that the jury heard over and over again testimony supporting the conclusion that Dr. Chung's ultrasound interpretation may have had no impact on what was plain as day from the CT report. The experts on both sides agreed that CT is the superior modality for detecting this type of growth, and the deal actually, I would say, was sealed with Dr. Golo's unequivocal testimony about his findings. His testimony could not have been more compelling. Dr. Golo explained that his CT report established that what he saw on CT was a teratoma, and to quote his testimony, it really couldn't have been anything else, and this, in effect, is what the report told Dr. Michael. He was fully aware, and this is undisputed, of the CT report identifying a teratoma, and very significantly, at trial, Dr. Michael said that he knew, and not just at the time of trial, but also at the relevant time in August of 2012, when he received the CT report and the ultrasound report, that the definitive, the more definitive modality for diagnosing a teratoma, but as Dr. Chung's trial counsel argued in closing, Dr. Michael rejected and ignored the CT without doing anything, not even calling Dr. Golo or Dr. Chung. So what must, or at least what may the jury have concluded regarding any impact of Dr. Chung's report on Ms. Perez's ultimate outcome? The jury heard that Dr. Michael had all the information that he needed. He would not have received more information if there had been a mention of the teratoma in the ultrasound report, and the jury also heard, and this came out of the mouths of plaintiff's experts, that Dr. Michael failed to act again in 2013, at a time when he undeniably knew about the teratoma, and according to plaintiff's experts, he should have then recommended removal of the mass. According to plaintiff's experts, the teratoma was not cancerous in March of 2013, and it could have removed, according to plaintiff's experts, during a straightforward laparoscopic procedure performed during the second trimester of the year. The jury would have found no link between Dr. Chung's conduct back in August of 2012 and the events in March of 2013. Now this business about the Jackson case that plaintiffs waited to cite until their reply, that case does not stand for the proposition that a defendant loses the work product privilege if the defendant testifies as a 213 F3. In fact, the materials that were at issue in that Jackson case were medical journal articles, and so the court found, and this came out of the third district, Justice Wright writing for the third district, that well, the journal articles were fair game on cross-examination when the defendant testified as an F3 expert, but this certainly doesn't stand for the proposition that the attorney-client privilege is gone merely because someone is disclosed as an F3 expert. In fact, there's no case that takes Jackson to that extent, and there are Rule 213, or rather Rule 23 cases, if you'll forgive me for mentioning one, one in particular written, authored for the third district by Justice Wright herself, that says no, no, no, no, no, no, no, that's not what we meant in the Jackson case, and that decision is the McCombs decision that was written subsequent to Jackson. So, you know, there's no question that that case does not support what the plaintiff is saying about 213, but what's more important about 213 is I have to correct what counsel says as far as the notion that the defendant, or rather the plaintiff, was not allowed to use the disclosure as an admission. The disclosure was raised over and over and over again. You have about one minute, Mr. Grand. I'm sorry? One minute. Okay, so let me just point the court to this, if I may, on the 213 issue, that when the issue came up, there was palliquy, this was during the adverse examination of Dr. Chung, and what happened was counsel for plaintiff then said, okay, fine, I'm going to move on, there's better stuff. That's a quote. And although the issue was revisited, counsel then proceeded to play a video twice during the cross-examination of Dr. Chung that brought out the very same information that was in Dr. Chung's discovery deposition that reflected the same concept that was in the 213 F3 disclosure, which was read to the jury during Dr. Bova's cross-examination, and that was over the defense objection, and was read to the jury during the plaintiff's closing argument. Thank you, counsel. You're done. Okay, thank you. Justice Connors. You're mute. You're mute. Not anymore, thank you. Mr. Grand, as far as Dr. Bova and the testimony that was used, demonstrative evidence, or not the testimony, but the use of the demonstrative evidence? Yes, your honor. It has to be relevant and it has to be fair. Now, let's talk about, you can give a shorter argument if you want on the relevant part, but the fair part, as far as that being brought up last minute. Can you say why that was fair? And it was a standard demonstrative exhibit type of evidence. What Dr. Bova was showing was just merely a different perspective from a reconstruction of the CT scan. All it did was help him to explain his fully disclosed opinions that, for the reason that Dr. Chung would not have seen the teratoma on ultrasound. So, the slides in question were showed just a few times during that examination, side by side with a different view, the coronal view, to which there was no objection. And it was merely a the reason that he said, here's my basis for concluding that Dr. Chung did not have seen anything on the ultrasound. And it was because the teratoma was outside of the field of view. And that's what this slide showed. And so, there was nothing new. There was no new basis. There was no new opinion. And also, it's certainly worth noting Judge Harmoning's very careful limiting instruction to the jury that that was not evidence, that the demonstrative exhibits were not evidence. So, I don't think there was any fairness or prejudice involved at all with that demonstrative. Thank you. That's all. Justice Harris. I'll take it. Okay. Mr. Grand, you would agree that even if you don't lose the attorney-client privilege, if you use yourself as an expert, that's what happened here, right? Dr. Chung was an expert on his own behalf? Dr. Chung was disclosed as an F3 in addition to... Right. So, the fact that you are a party doesn't protect your interrogatory answers from being usable, correct? Well, they were used in this case, Your Honor. I understand. But I do not believe that you cited any case, and I'm not familiar with any case, which suggests that the mere possibility that cross-examination is going to go into the territory of attorney-client privilege is a basis on which to cross-examine. I didn't have a case to cite specifically on that point, but I would think that would be certainly within Judge Harmoning's discretion, Your Honor. There was no case that said that the interrogatory answer, which was prepared by counsel as an explanation of what anticipated to be the testimony at trial, was a means for a foray into the attorney-client relationship or attorney-client communications. And Judge Harmoning was very clear in addressing this issue in the hearing on the post-trial motion. He was concerned about that, but he, in his view, he was sort of waiting during the trial for plaintiff's counsel to ask a question that would not have invaded the attorney-client privilege or potentially invaded it. And I think it's very important to note, there was no blanket restriction on using this interrogatory answer. There was an objection that was sustained to one of the proposed uses of it. What was, I'm sorry, what was that proposed use? The plaintiff was poised to cross-examine Dr. Chung by asking him about the interrogatory answer. And at that point, counsel said, well, I'll just, I'll use, you know, I'll use better stuff, is the term that he used. He went to the deposition. I'm sorry, back up. What was your objection to that use? The objection was that it was a, that there was, there was no basis for cross-examination that may have invaded the attorney-client privilege that would ask Dr. Chung why there was a change between the initial disclosure and the supplemental disclosure. Okay. So your objection was based on privilege as well. That was part of it, yes. But also that it wasn't an admission. It was a 213-F3 disclosure of anticipated testimony that was seasonably supplemented pursuant to the rule and pursuant to Judge Flanagan's case management order. All right. Thank you, counsel. Mr. Griffin? Yes. May it please the court, Hugh Griffin, again, on behalf of St. Alexis Medical Center. I'm going to address the agency issues, but since counsel asserted that we were the ones who called Dr. Bova, he actually was a shared expert, but I just want to address something very quickly on him. He, his deposition for some reason was never taken. So, and the night before he's going to testify, he sent us his slides. And that's the first time we saw them. We tried to convey them that night. We conveyed them the next morning. And I have them right here in my hand, the ones that are an issue. I'll give you the, it's supplemental E-425, 426, 427. And it shows basically the frontal view and then this sagittal view, which is pretty much the frontal view turned sideways, but it shows the teratoma location. And there never was really any dispute. That's where it's located. Here's two ways to look at it. And his testimony was whichever one you look at, Dr. Chung's field of vision would not have gone that high and seen it. And in their closing, they said, we're not saying Dr. Chung should have seen the teratoma. And Mr. Basier said it today. He said it in his, I wrote it down. We're not saying he should have seen the teratoma. That's the only purpose for which these exhibits were used. So they can't conceivably rise to the level of any kind of error. Going to agency, St. Alexis was sued solely as an apparent agent of Dr. Chung. So obviously we adopt all the arguments that Mr. Grand just made because of the judgment in favor of Dr. Chung is affirmed, then the verdict and judgment in favor of St. Alexis must be affirmed. But I want to spend the rest of my time that there's a wholly separate, independent basis to affirm the judgment in favor of St. Alexis. And it doesn't rely on the two issue rule or the general verdict rule or some presumption of what the jury found. It relies on their express separate finding in favor of St. Alexis on the apparent agency issue. The verdict form said on August 11th, 2012 was defendant radiologist Jeffrey Chung MD, the apparent agent of defendant St. Alexis Medical Center. The answer was no. As set forth in pages 17 and 19 of our brief, we believe we should have had a directed verdict on the issue. We moved for a directed verdict. And Judge Harmon said, no, I'll reserve on it, but it's going to the jury. And it went to the jury and they made the finding that they did. And none of the errors that are being argued here with respect to Dr. Chung, there's no claim that any of those had any effect on the jury's finding on apparent agency. The only two issues raised are the ones mentioned by Justice Connors a minute ago, that the plaintiff tendered an IPI 50.10, an actual agency instruction that wasn't given, and then tendered a modified 105.10, that added two words to the IPI instruction as it then existed. And it was incorrect. And I'll get to that. And those are the only two surveyed errors with respect to the apparent agency issue. 50.10, it's an actual agency instruction that asked the jury to decide in the way it was drafted. Was Dr. Chung an actual agent here, or was he an independent contractor? That was never an issue in this case. It was never pled. Plaintiff never sought to amend the complaint. In fact, page 33 of their brief, they reiterate plaintiff's only claim against St. Alexis was based on the doctrine of apparent agents. If it had been pled, it would have been directed out because there wasn't a scintilla of evidence, which is the ultimate requirement for actual agency, that St. Alexis controller had the right to control Dr. Chung's exercise of medical judgment in reviewing his studies or his oversight. We cite the cases for that at pages 23 and 25. One is Justice Harris's opinion in Hammer versus Barr affirming summary judgment because there was no evidence that the hospital controlled the physician's exercise of medical judgment. Basically, what they're saying is, Judge Harmony erred in failing to give an instruction on an issue that was never pled and that was never approved. And I mean, it's just no conceivable basis to come to that conclusion. So now we come to the instruction 105.10. The court gave it exactly the way it was in the IPI at the time of trial and as it had been for the prior 15 years. And it's told the jury that plaintiff was required to prove that Mrs. Perez neither knew nor should have known that Dr. Chung was not an employee of St. Alexis. There's nothing incorrect. Justice Conner said, is that an incorrect statement of the law? No, it wasn't an incorrect statement of the law. In fact, pages 21 and 22 of our brief, we quote a number of cases, including there's quotes from Gilbert and from York that described the apparent agency doctrine in terms of whether the plaintiff or the if you look at plaintiff's fourth amendment complaint C-787, that's the way they pled it. Marilyn neither knew nor should have known that Dr. Chung was not an employee of St. Alexis. So now we come and it's true that for some reason, we have a new IPI now and they added the word or agent and plaintiff's claiming, well, it should have, the jury should have been told the plaintiff had to prove that Mrs. Perez neither knew nor should have known that Dr. Chung was not an employee or agent of St. Alexis instead of just an employee. I mean, all employees are agents. So I don't know why the IPI changed. There's no comment about it. But I do know one thing that adding those two words to this instruction could never have changed this verdict. The consent form covered both. The consent form was our defense to the apparent agency claim and it covered agents and employees. If I could read quickly, independent status of physicians. I recognize that any or all physicians who furnish services to me during this admission are independent contractors and not agents or employees of the hospital. That was the defense on which, that's how we defended the apparent agency claim. As we've cited the cases, you know them as well as better than I. I mean, no error rises to the level of reversible error unless it's shown to be substantially prejudicial and that it would have affected the outcome of the trial. One minute counsel, wrap up please. Thank you. Thank you. Justice Connors. No questions. Thank you. Justice Harris. Since this trial, 105.10 was changed. Is that correct? Since this trial, it was subsequently amended to include the word agents or before the word employee. Yes. Okay. Then that made it appears in case law, but on the pages. But at the time that the court rendered 105.10, those words were not included. So wouldn't it be correct that this jury was instructed as to what was not accurately the state of the Illinois law? I couldn't agree with that because of the cases that we cited. If I can find the page numbers again, but we cited a number of cases. I believe it was page 19 where the courts themselves have used that language. Did the plaintiff know or should he or she have known that the doctor was not an employee? I mean, they've used that language without the word agent. They've used the word agent too. You can find it both ways. But the primary point I'd like to make is that this consent form covered both. And the consent form was the defense. That was our defense to this claim. I mean, yes, we had a radiological department. Yes, we chose Dr. Chung. But the third element of the proof that they must come up with is they must prove the plaintiff. Neither knew nor should have known that Dr. Chung was not an employee of St. Alexis, or if you want to say he was not an employee or agent. And the consent form addressed both, and that was our defense. So I don't think it's incorrect to say employee. Again, all employees are agents. Somewhat redundant, but in any event, the consent form covered it. And there's no conceivable way to conclude that had those two words been added to this result. Anything else, Justice Harris? No, thank you. Just to pick up from that last point, while all employees are agents, not all agents are employees, correct? That's true. And that's where you get in to actual agency. And that's when you get into a 50.10. And that's why I kept saying he's mixing apples and oranges in this case. He's arguing in the brief that he was an agent. He's making that actual agency argue. But it never got into the case. It was never pledged. It would never have flown anyway, because there was no evidence of control. So from an apparent standpoint, you're saying there's no difference between them? Absolutely. Because it all rises and falls. But even if there was, it couldn't have made any difference in this case, because the consent form expressly applied to both. And that's our defense. This was our defense to the case. My last question, and I'm pretty sure I know the answer to this, but if we do, we have to, unless we find some trial error or reverses to Dr. Chung, there's no reason to even have to address your liability or your client's liability, correct? Because it's a derivative liability. Absolutely, that's correct. Now, counsel made the point about, well, what if their counsel was involved in that case? He said, we didn't respond to it. Well, he didn't sign any law for it because of what you just said. There are two separate cases the plaintiff has to prove. He had to prove the case against Dr. Chung, that was one. He had then to prove the separate apparent agency case, that's number two. Because again, as you just said, our liability was solely derivative through that theory. And so there's no error in the apparent agency issue case. I believe there's error in the Dr. Chung case. It's both reasons we respectfully submit that both judgments should be affirmed. Mr. Bader. Thank you, your honor. Let me start with the consent form. The consent form was horrible. It was meaningless. Maryland sees that it covers that residents and medical students aren't agents. He's an educated person. She knows they are. She knows any or all is something that is not taught in any upper education. You never use any or all. And she would know that it means some, one, or all. And again, we didn't say that Chung was an actual agent. It's all in the instructions. We put on evidence that he was not an independent contractor. And the jury therefore could have easily determined that Maryland should not have known that he was an independent contractor. Maryland should not have known that he was. That's a parent agency. What's in the eyes of the person reading that form. The verdict form is not consistent with 105.10. The verdict form talks about a parent agent and 105.10 that was the it's not in the form, in the instruction. The counsel said that in determining that the sagittal view was just a compare, was just demonstrative. She said, it's just a different perspective. It's a different perspective of the actual CT. Supposedly, I don't know if it's a different perspective, but he's, Bova said it was that Maryland's, and if it's a different perspective, it's real evidence. There's no question. Again, demonstrative evidence would be a picture of a stock photo of a teratoma that we weren't able to use. The original and the proximate cause issue, the original CT said consistent with a teratoma. Michael and his experts said that meant it was a questionable teratoma and that the, some of the findings in there were also consistent with fibroids. The privilege issue, I still haven't heard what's privileged about it. You have an admission, you put it up. I wasn't going to say, didn't you tell your lawyer this? Under any circumstances, I wouldn't say that. If they felt the need to waive a privilege, which they wouldn't, that's a separate issue, but I wasn't going to, why would I go into that? I know better. They haven't said why it's privileged, but, and also on the two issue rule, they ignored the Inman case. There is, and they still haven't told you a special interrogatory that they could have propounded. There isn't one. If you had known all of this about Dr. Chung, would you then have found proximate cause? The 213. Yes, I tried to do my best to use it. Both times, in closing, when I used it, all that happened with that was that the judge said, it's not evidence. What the lawyer says is not evidence. Instead of if we had used it, he would have said, if he had shown the 213, he would have said it is evidence. We relied on that 213 for our whole trial preparation. They would not have been able to show the supplemental 213. I'm not sure the theory there, but that's a prior consistent statement. We could have shown this. He could have then changed his testimony to be consistent with the supplemental one, but they wouldn't have the supplemental one. The 313 surgery, there is no question there was a risk to the babies, the Maryland's twins at 42 years old, and the risk was up to 50%. The supplemental, excuse me, no Dr. Chung, no St. Alexius. We cited cases on cumulative error and attributing it to both no Dr. Chung, no St. Alexius. There has to be a line, and they crossed the line. They have to have crossed the line. With Dr. Bova, they had to have crossed the line, in addition to all the going fishing. They had to go fishing and this and that. The whole defense of Dr. Chung was basically done by St. Alexius. Counsel, your time's up. Do you want to make a last point? Are there any questions? We're not saying that Dr. Chung should have seen the teratoma on the ultrasound. We've never said it, but based on his custom and practice, based on every radiology custom and practice, based on the perjury, he would have looked at the CT. He would have known there was a teratoma, and he would have reported the teratoma, and we wouldn't be. Thank you. Any questions, Justice Harris or Justice Connors? Thank you, everybody. We will take this matter under advisement. Thank you all for participating and for your patience. Thank you for the opportunity. Thank you.